IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

TONI L. MORGAN,

    Plaintiff,

V.                                      CIVIL ACTION NO. 3:04-1197

JO ANNE BARNHART,
Commissioner of Social Security,

    Defendant.

**FINDINGS AND RECOMMENDATION**

In this action, filed under the provisions of 42 U.S.C. §405(g), plaintiff seeks review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits. The case is presently pending before the Court on cross-motions of the parties for judgment on the pleadings.

Plaintiff protectively filed her application on June 17, 2002, alleging disability commencing July 30, 2001, as a consequence of bulging cervical discs, bone spurs on two lumbar discs, depression, degenerative joint disease, osteoporosis and bad knees. On appeal from an initial and reconsidered denial, an administrative law judge, after hearing, found plaintiff not disabled in a decision which became the final decision of the Commissioner when the Appeals Council denied a request for review. Thereafter, plaintiff filed this action seeking review of the Commissioner's decision.

At the time of the administrative decision, plaintiff was forty-four years of age and had obtained a GED.  Her past relevant employment experience consisted of work as a cook.  In his decision, the administrative law judge determined that plaintiff suffers from "status post arthroscopic partial medial menisectomy of the left knee and bone cyst; lumbosacral spine pain without radiculopathy, degenerative disc disease; neck pain without radiculopathy, degenerative disc disease; partial tear of the left rotator cuff with impingement in the left shoulder, status post mini-open rotator cuff repair and excision of the osteophyte of the left elbow; and obesity," impairments which are severe.   Though concluding that plaintiff was unable to perform her past work,[1]   the administrative law judge found she had the residual functional capacity for a limited range of light level work.  On the basis of this finding, and relying on Rule 202.21 of the medical-vocational guidelines[2] and the testimony of a vocational expert,  he  found plaintiff not disabled.

From a review of the record, it is apparent that substantial evidence supports the Commissioner's decision.  As the administrative law judge noted, the medical evidence reveals plaintiff is limited by problems with her left knee, back,  neck and left shoulder/arm.[3]  An X-ray of the left knee in July of 2002 was interpreted as showing a "sclerotic density" in the tibia.  It was also determined that plaintiff had possible internal derangement of the knee, and an arthroscopic partial medial meniscectomy was performed on December 3, 2002.  Eight days later, on December 11, it

---

[1] This finding had the effect of shifting a burden of production to the Commissioner with respect to other work plaintiff was capable of performing.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981); McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

[2] 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 2.

[3] While the administrative law judge also determined that plaintiff's obesity was a "severe" impairment, none of the treating/examining physicians noted restricted movements or other problems due to this impairment.

was reported that plaintiff was able to walk normally and had full range of motion of the knee. She was then referred to Columbus, Ohio where another surgery was performed to remove the tibial lesion and insert a bone graft at the removal site. The surgery was performed in late January of 2003, and plaintiff was released by her surgeon. She was no longer using crutches at the time of her next appointment April 29, 2003.

During a consultative physical examination by Dr. Kip Beard on October 14, 2003, it was observed that plaintiff had a mild, left-sided limping gait with tenderness over the left knee and some mild swelling. Dr. Beard also noted some mild laxity in both knees but normal range of motion. Neurologically, plaintiff was able to walk on the heels, toes and in tandem, although with a limp and complaints of left knee pain. She also had difficulty arising from a squat. There is no indication of any further significant problems with the knee.

Plaintiff also has a history of treatment for neck and back pain, with reports from Dr. Anita Dawson, a treating physician, reflecting complaints in this regard in June 2002. Dr. Glenn Kluge, who performed a consultative physical exam on October 8, 2002, reported no tenderness in the cervical, thoracic or lumbosacral portions of the spine, and range of motion was full in the lumbar spine but limited in the cervical area. Though her gait was antalgic, plaintiff was still able to ambulate without assistance and neurological abnormalities were not detected.

Dr. Dawson and Dr. Bal Bansal treated plaintiff's neck and back complaints. Their reports reflect findings of tenderness in these areas with spasm noted on occasion. MRI's performed in April of 2003 were interpreted as showing disc bulging at L4/5, C3/4, C5/6 and C6/7 with some foraminal stenosis. Nerve conduction studies were considered negative for any kind of radiculopathy from the cervical or lumbosacral areas and neurological abnormalities were not

detected during exam. A myelogram and CT scan of plaintiff's back and neck, performed on June 3, 2003, were interpreted as showing "mild" disc bulging and facet arthropathy at L4/5 and L5/S1 with resultant "mild" effacement of the L4/5 anterior thecal sac. No abnormalities were shown in the thoracic spine. In the cervical spine, mild degenerative endplate changes and disc bulging were seen at C2/3 through C4/5 with endplate changes, disc bulging and mild neural foraminal stenosis present at C5/6. The endplate changes were also present at C6/7 with mild foraminal stenosis on the right and mild to moderate on the left.

Although plaintiff reported that her neck pain radiated into the right arm, causing numbness and tingling in several fingers of the right hand, Dr. Beard, during his October 14, 2003 exam, reported she had full range of motion of both hands without tenderness or impairment of ability to make a fist, grip or manipulate.[4] Tenderness was observed in the cervical and lumbosacral spine with some limitation of motion. Neurologically, plaintiff was able to walk on heels, toes and in tandem, though with a left leg limp and complaints of left knee pain. While Dr. Bansal more recently diagnosed plaintiff as possibly having rheumatoid arthritis, based on symptoms and blood tests, a specialist examining her concluded otherwise. Dr. Bansal's more recent reports reflect a diagnosis of fibromyalgia syndrome.

Left shoulder pain and limitations have also affected plaintiff. Dr. Kluge documented full range of motion of the shoulders and full upper extremity strength in October 2002; however, a May 2003 MRI was consistent with a rotator cuff tear. Dr. Beard observed some crepitation, tenderness and a mildly positive impingement sign in October 2003, along with mild weakness in

---

[4] While decreased sensation was detected in the third through fifth fingers of the right hand, this obviously did not impair plaintiff's ability to use her hands.

the shoulder. Range of motion was considered normal. A spur was also detected in the left elbow where there was tenderness but full range of motion. In November 2003, between hearings, plaintiff had surgery to repair the rotator cuff tear and to remove the osteophyte in the left elbow.

Plaintiff also received treatment for headaches. When hospitalized overnight in July of 2003 for treatment of a migraine, she reported a history of chronic headaches of this type, although frequent treatment is not documented in the record. Dr. Bansal added new medication and observed, on July 25, August 19, October 20 and November 20, 2003, that the migraines were doing "very well" with medication. The rest of this physician's notes, which go through December 31, 2003, contain no indication of problems with this condition. The evidence thus supports the administrative law judge's conclusion that, after starting treatment, plaintiff's headaches were no longer a limiting impairment.

Finally, plaintiff testified at the first hearing, on August 8, 2003, that she perceived most of her problems to be physical, not mental. She admitted she had never had or been recommended to have mental health treatment. At the second hearing, however, which was held five months later, plaintiff testified that her mental functioning was deteriorating and she was having concentration and memory problems as well as mood swings.

The Commissioner initially sent plaintiff to Lisa Tate, M.A., for a mental status evaluation on September 30, 2002. She was described as cooperative and able to relate well but displayed a depressed mood and restricted and slightly tearful affect. Concentration was average, memory and pace normal, and I.Q. results were in the average range. Plaintiff reported a number of daily activities that were inconsistent with her claims of significant limitation due to depression. She cleaned the house, did laundry, cared for pets, cooked, worked on crafts, ate out twice a month

5

and attended yard sales frequently. Ms. Tate's diagnosis was adjustment disorder with depressed mood.

Some of Dr. Dawson's notes from 2000 and 2001 reflect complaints of anxiety which was treated with medication. While she also mentioned depression infrequently in 2002 and 2003, her reports do not reflect any significant problems resulting from these conditions. Dr. Brenda Dawley, plaintiff's gynecologist, made more detailed notes about plaintiff's complaints of decreased energy, depressed mood and tearfulness, but there is no indication she felt these problems were significant enough to be treated by a mental health professional. Dr. Bansal reported on April 2, 2003, a diagnosis of major depressive disorder, mixed, with generalized anxiety disorder, but noted these appeared to be in "good remission." On August 5, 2003, he noted plaintiff's depression was "much better" with the medication Wellbutrin. Two weeks later, he noted her mental status exam was "unremarkable." Though he observed on October 20, 2003 that plaintiff's depression had "recently" worsened somewhat, just one month later this physician described it as "in good remission." Dr. Bansal reported on December 18, 2003, that plaintiff wanted a counselor with whom to discuss some issues; however, her mental status was again characterized as "unremarkable" and there is no indication that he recommended seeing a mental health professional. Considering these findings, the administrative law judge determined that plaintiff's depression was not significantly limiting and therefore did not constitute a "severe" impairment. The evidence clearly provides substantial support for this finding.

There are a number of opinions in the record as to plaintiff's residual functional capacity. On July 25, 2003, Dr. Oliashirazi, who had treated plaintiff primarily for knee pain, assessed her as extremely restricted with an ability to lift only three pounds total and stand and walk

a total of one hour only, as well as an inability to climb, balance, stoop, crouch, kneel or crawl. In an assessment completed three days later, Dr. Dawson concluded plaintiff could lift and carry no more than ten pounds, stand and walk thirty minutes total, fifteen at a time, sit one hour total, thirty minutes at a time and never perform postural activities except occasional balancing. In addition to restrictions on reaching, handling, feeling and pushing/pulling, she also assessed a number of environmental limitations.

Shortly thereafter, on August 5, 2003, Dr. Bansal opined plaintiff could lift and carry only five pounds occasionally, two pounds frequently; stand and walk fifteen minutes at the most; sit fifteen to twenty minutes at most; never engage in any postural activities, including bending; had limited ability to reach, handle, feel, push and pull; and, had numerous environmental restrictions. This physician also expressed the opinion in many of his treatment notes that plaintiff was totally disabled and could not perform any sustained work activity. Following his October 14, 2003 consultative exam, Dr. Beard also assessed plaintiff's residual functional capacity, finding she could lift and carry twenty-five pounds maximum with the right arm, twenty frequently and fifteen pounds maximum with the left arm, ten frequently. He felt she could stand and walk a total of six hours per day, one to two hours at a time and sit six hours total, two hours at a time. While he felt balancing could be done frequently, Dr. Beard determined the other postural activities could be performed only occasionally. He also felt reaching repetitively with the left arm should not be done and was uncertain about plaintiff's ability to feel with the right hand. Pushing and pulling as well as exposure to heights, moving machinery and humidity were also restricted.

The state agency medical advisors' opinions were submitted in October of 2002 and January of 2003, before a significant portion of the evidence was added to the record, and reflect

findings of ability to perform medium level work, with the earlier assessment reflecting inability to climb ladders, ropes or scaffolds or be exposed to hazards, while the latter just reflects limitation on exposure to extreme cold.

The administrative law judge, concluding the assessments from Drs. Oliashirazi, Dawson and Bansal were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and were not consistent with either their treatment notes or "the other substantial evidence in [the] case record,"[5] declined to adopt their opinions. This finding has substantial support in the record as the objective findings simply do not support the limitations assessed. Finding Dr. Beard's assessment more reasonable in light of the evidence, the administrative law judge adopted it but clarified that plaintiff could only occasionally push and pull and use hand controls with the left upper extremity, not to exceed fifteen pounds; only occasionally reach in all directions, including overhead with the left upper extremity; and, only occasionally push/pull or use foot controls with the left lower extremity. He did not assess restrictions on use of the right hand for feeling and, given the lack of evidence demonstrating any limitation from possible decreased sensation in that hand, the Court concludes this finding, as well as the remainder of the residual functional capacity assessment, is well-supported by the substantial evidence in the record.

While plaintiff complained of significant restrictions on her activities due to pain, the administrative law judge, taking account of the evidence as well as his observations of plaintiff at the hearing, concluded that her credibility was poor. Some of the factors most persuasive to him include plaintiff's many activities of daily living as well as an absence of evidence establishing neurological abnormalities or ongoing difficulties with headaches or depression. In view of the

---

[5] See 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2).

evidence, and taking account of the administrative law judge's "opportunity to observe the demeanor and to determine the credibility of the claimant," these findings are entitled to "great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). Finally, in response to hypothetical questioning which included plaintiff's age, education, work experience and a reasonably accurate profile of her functional capacity and overall medical condition, a vocational expert testified that there were significant numbers of light and sedentary jobs in the national economy which plaintiff could perform.

Resolution of conflicts in the evidence is within the province of the Commissioner, not the courts, Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964), and if the Commissioner's findings are supported by substantial evidence this Court is bound to uphold the decision. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). In the present case, the evidence, though conflicting, provides substantial support for the Commissioner's findings with respect to plaintiff's impairments and residual functional capacity. Under such circumstances, the decision of the Commissioner should be affirmed.

## RECOMMENDATION

In light of the foregoing, it is **RESPECTFULLY RECOMMENDED** that plaintiff's motion for judgment on the pleadings be denied, that the like motion of defendant be granted and the decision of the Commissioner affirmed.

Plaintiff and defendant are hereby notified that a copy of these Findings and Recommendation will be submitted to the Honorable Robert C. Chambers, United States District

Judge, and that, in accordance with the provisions of Rule 72(b), Fed.R.Civ.P., the parties may, within thirteen days of the date of filing these Findings and Recommendation, serve and file written objections with the Clerk of this Court, identifying the portions of the Findings and Recommendation to which objection is made and the basis for such objection.  The judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made in accordance with the provisions of 28 U.S.C. §636(b) and the parties are advised that failure to file timely objections will result in a waiver of their right to appeal from a judgment of the district court based on such Findings and Recommendation.  Copies of objections shall be served on all parties with copies of the same to Judge Chambers and this   Magistrate Judge.

The Clerk is directed to file these Findings and Recommendation and to mail a copy of the same to all counsel of record.

DATED:  June 20, 2006

_____
MAURICE G. TAYLOR, JR.
UNITED STATES MAGISTRATE JUDGE